UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

DAWN LUGENE McCOLLUM,     )
    Plaintiff,             )
                             )
    v.                    )     Case No: 4:14-CV-66-HSM-CHS
                             )
CAROLYN W. COLVIN,       )
Commissioner of Social Security,  )
    Defendant.            )

REPORT AND RECOMMENDATION

I. Introduction

This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking

judicial review of the final decision of the Commissioner denying the Plaintiff a period of

disability and disability insurance benefits, Title II of the Social Security Act, 42 U.S.C. §§

416(I), 423.

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule

72(b) of the Federal Rules of Civil Procedure for a report and recommendation regarding the

disposition of Plaintiff's Motion for Summary Judgment (Doc. 10) and Defendant's Motion for

Summary Judgment (Doc. 11).

For the reasons stated herein, I RECOMMEND the decision of the Commissioner

be AFFIRMED.

II. Background

A.  Procedural History

In August 2011, Plaintiff applied for disability insurance benefits under Title II of the

Social Security Act ("the Act"), 42 U.S.C. §§ 401-434 based on "spondylolisthesis"  (Tr. 132-

38).  Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final

1

decision" of the Commissioner of the Social Security Administration ("SSA"). Plaintiff's claim was denied initially and on reconsideration (Tr. 81-82). On May 10, 2013, following a hearing, an administrative law judge ("ALJ") found that Plaintiff was not under a "disability" as defined in the Act (Tr. 34-46).

Plaintiff's date of last insured status is December 31, 2015 (Tr. 39). She has not engaged in substantial gainful activity since August 4, 2011 (Tr. 39). The ALJ found that Plaintiff had severe impairments that included degenerative disc disease of the lumbar spine and mild degenerative changes of the right knee with a mild tilt and subluxation of the patella (Tr. 39). However, the ALJ found that she did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. part 404, subpart P, appendix 1 (Tr. 40). The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a full range of light work (Tr. 40) and was therefore not precluded from performing her former work as a hospital worker/housecleaner and service clerk (Tr. 44). Consequently, the ALJ found that Plaintiff was not disabled (Tr. 46). In the alternative, the ALJ found that even if the Plaintiff was limited to light work with a sit/stand option every 15 to 30 minutes, there were still jobs within the national economy which she could perform such as ticket taker, labeler, and storage facility rental clerk (Tr. 45).

On August 5, 2014, the Appeals Council denied Plaintiff's request for review (Tr. 1-4). In its denial, the Appeals Council refused to consider an MRI taken of Plaintiff's spine after the ALJ's decision on the ground that the MRI was not relevant to Plaintiff's condition at the time the ALJ entered her decision (Tr. 2). Plaintiff has exhausted her administrative remedies, and the ALJ's decision stands as the final decision of the Commissioner subject to judicial review.

B.  Relevant Facts

*1. Plaintiff's Age, Education, and Past Work Experience*

Plaintiff was 53 years of age at the time of the ALJ's decision, having been born in October 1959.  Plaintiff worked previously as a house cleaner, an order processor, a service clerk, a surgical support tech in hospital housekeeping, and warehouse driver/processor (Tr. 191).  This employment history consists of unskilled work that varies in physical demand from light to medium and one job that was semi-skilled and sedentary in nature (Tr. 72).  Plaintiff attended school into the 9th grade and ultimately obtained her GED (Tr. 58, 219).

*2.  Medical Records*

*a. Dr. Juris Shibayama*

Plaintiff first saw Dr. Juris Shibayama for her back condition on August 8, 2011 (Tr. 311-312).  The assessment at that time was neck pain due to cervical disc degeneration and lumbar spondylolisthesis with likely spinal stenosis and radiculopathy[1] (Tr. 311).  Plaintiff was 5'4" tall and 243 lbs.  *Id.*  She reported worsening pain in her lower back and right thigh with numbness and tingling in her right anterior thigh.  She stated that standing and climbing stairs as well as rising from a sitting position increased her pain and that sitting decreased her pain.  She reported heat, ice, and a brace afforded no significant pain relief.  *Id.*  She tested 5/5 for strength in all lower extremity muscle groups.  Plaintiff could extend her back 20 degrees with discomfort and flex 60 degrees with mild discomfort (Tr. 312).  Dr. Shibayama noted patient was "in no acute

---

[1] While Plaintiff has an impairment in her right knee as acknowledged by the ALJ in her decision denying benefits, Plaintiff does not contend that the ALJ evaluated her knee condition improperly, and Plaintiff does not discuss her knee condition in her motion.  Plaintiff's motion focuses solely on her lower back condition, and, therefore, this report and recommendation does as well.

3

distress" during the visit (Tr. 311).  Plaintiff was taking Prednisone, a medication for blood

pressure (Tr. 311).  Dr. Shibayama advised her that she needed an MRI of her spine, but

Plaintiff reported that she could not afford one at that time (Tr. 312).

On August 18, 2011, Plaintiff saw Dr. Shibayama again.  She reported "significant pain

in her back and legs"  (Tr. 313).  She could extend her back 20 degrees with discomfort and flex

60 degrees with mild discomfort.  She had numbness in her right anterior thigh down to the knee

in the L3-4 distribution and pain in the left L3-4 distribution.  Strength was 5/5 in all lower

extremity muscle groups.  *Id.*  She had been able to obtain an MRI scan which revealed

spondylolisthesis of L3 on L4, with moderate facet joint arthropathy resulting in a lateral recess

and foraminal impingement (Tr. 313).  Dr. Shibayama assessed spondylolisthesis with

radiculopathy.  *Id.*  Dr. Shibayama advised that physical therapy and epidural steroid injections

were options but stated that, if her pain was so bad she could not work after six weeks of this

treatment, then she should have surgery (Tr. 251).  Plaintiff saw Dr. Shibayama again on August

23, 2011, and a physical examination again revealed 5/5 strength and numbness in her right

anterior thigh to the knee (Tr. 249).  Dr. Shibayama opined Plaintiff to be "significantly

debilitated by pain" despite physical therapy and unable to work (Tr. 250).  Therefore surgery

was scheduled for decompression and fusion of the L3-4 vertebrae (Tr. 250).

On September 9, 2011, Dr. Shibayama operated on Plaintiff and performed a

Transforaminal Lumbar Body Fusion at the L3-4 vertebrae[2] (Tr. 254 to 256).  At the first post-

_____

[2] Transforaminal lumbar interbody fusion (TLIF) "is a procedure that fuses the anterior and
posterior columns of the spine through a posterior approach. A bone graft and interbody spacer
stabilize the anterior portion while the posterior is locked in place with pedicle screws, rods and
bone graft."  Spine-Health, http://www.spine-health.com/video/transforaminal-lumbar-interbody-

4

operative visit on September 15, 2011, Plaintiff was doing very well and ambulating well. Her strength in all lower extremity muscle groups measured 5/5. The hardware implanted at the L3-4 vertebrae was "in excellent position" and the interbody fusion was consolidating well (Tr. 248). Dr. Shibayama advised she would be off work three months from the date of surgery and he gave Plaintiff a refill on Percocet-5, 40 tablets. *Id.* Dr. Shibayama followed up with a telephone call on September 23, 2011. He noted Plaintiff was still doing well but that she had had an event where she bent forward to pick up her dog and that caused her some pain in her back. He stated that she took the next day off and that she was feeling much better (Tr. 247).

At the following visit to Dr. Shibayama on October 27, 2011, Plaintiff estimated she was 50% better (Tr. 315). Dr. Shibayama prescribed 1-2 Percocet-5 tablets as needed and stated Plaintiff was "ambulating well, and despite some soreness and stiffness, she was doing well." *Id.* The hardware at L3-4 was "in excellent position" and the interbody fusion was "consolidating well." *Id.* He released her to lift up to 30 pounds, counseled her to walk as much as possible, and noted that he would see her again in six weeks. *Id.*

Plaintiff visited Dr. Shibayama again on December 8, 2011, three months after "post L3-L4 minimally invasive decompression and fusion" (Tr. 314). Dr. Shibayama stated in his notes:

> Pain wise she is doing very well. She is almost never taking Percocet. She is ambulating a lot. She states when she ambulates a lot though her legs swell bilaterally. She states the more she walks, the more she swells. She also states she has some discomfort in her back and sometimes some swelling feeling.
>
> *            *            *
>
> For the discomfort in her back, I would recommend low back therapy at this point. This is a normal finding at this point. She really is having more discomfort

fusion-tlif-video (last visited February 10, 2016).

> than pain in the fact that she is not even taking her Percocet for pain.
>
> Her bigger concern is swelling in her legs. She states she will swell a lot while she is ambulating. She is going to see her primary care provider regarding this. I do not think this is an issue related to the lumbar spine.

(Tr. 314). Examination revealed "no appreciable swelling" of the back and "[t]here may be some swelling present [of the back], although, its [sic] not dramatic." *Id.* Strength was 5/5 of the lower extremities, the hardware at L3-4 was "in excellent condition" and the interbody fusion was "consolidating well." *Id.* Dr. Shibayama stated he would not release her to work for another month and that she may need a total of three months before she could return to work. *Id.*

Plaintiff next saw Dr. Shibayama on January 5, 2012. Plaintiff reported the swelling in her legs was much better. Her diuretic had been increased, and Plaintiff had only taken one Percocet in the past month when she had a really bad day (Tr. 316). Plaintiff had been participating in therapy and "[s]he feels more of a swelling feeling in her thighs and back and not really a pain." *Id.* He counseled that she should try to return to her normal routine; however, he authorized her to be off work for two more months reasoning, "[f]or a lumbar fusion such as what she had I would not expect her to return to her previous occupation for 6 months from the date of surgery." *Id.* Dr. Shibayama directed Plaintiff to continue physical therapy for another month which he hoped would reduce the swelling in her legs. *Id.*

Plaintiff's last visit with Dr. Shibayama occurred on February 9, 2012 (Tr. 320). Plaintiff reported she was about the same as she was in the January visit, and that she had continued physical therapy, but still experienced a swelling feeling in her thighs and back. *Id.* Plaintiff reported she could stand and walk for about 15 minutes at a time. She continued to take Percocet on an as needed basis. *Id.* Plaintiff advised Dr. Shibayama she needed to return to work by

February 16, 2012. In his treatment notes, Dr. Shibayama wrote,

> ….I wrote her a release to go back to work. I do not want her lifting over 30 pounds. I want her to limit bending and stooping. She states she has problems standing 15 minutes or longer at a time. I therefore wrote her a restriction that she needs to alternate sitting and standing 15 minutes at a time.
>
> She is continuing to complain of radicular complaints into her legs. I am going to start her on Neurontin. I am also going to get a new MRI to ensure that we are not missing anything. I will see her back after the MRI for further treatment recommendations.

*Id.* The February 9, 2012, visit was Plaintiff's last visit to Dr. Shibayama.

When Plaintiff attempted to return to work on February 16, 2012, her employer would not allow her to work with those restrictions (Tr. 68). Plaintiff was formally terminated by her employer a few days later, and, as a result, Plaintiff lost her health insurance benefits (Tr. 224). According to Plaintiff, she was not able to return to Dr. Shibayama after she lost her health insurance and could not afford to receive any further treatment at that time (Tr. 61). Between February 9, 2012, and the day she was terminated from her employment, Plaintiff did not obtain an MRI or continue with physical therapy.

### b. Maury County Health Department

After the hearing before the ALJ but before the ALJ issued her opinion, Plaintiff supplemented the record with medical records from the Maury County Department of Health (Tr. 365-78). In 2012, Plaintiff went to the Maury County Health Department on at least six occasions during which she was assessed for anxiety, asthma, GERD, hypertension, and a wart on her thumb (Tr. 365-378). While her back was not treated, Plaintiff did report that she could not "sit or stand long" (Tr. 373). Treatment notes stated she is "trying for disability" (Tr. 375, 377). A treatment note dated May 31, 2012, states, patient "was advised not to seek narcotics

7

here" (Tr. 378).

### c. DDS Consultant Opinions

On December 6, 2011, DDS Medical Consultant Dr. James Gregory, an internal medicine specialist, reviewed Plaintiff's medical records and concluded, based on Plaintiff's spondylolisthesis and post-surgery status, that she currently had a severe impairment which would improve to non-severe within twelve months. Three months later, on March 12, 2012, DDS Medical Consultant Dr. Nathaniel Robinson, a surgeon, reviewed Plaintiff's medical records and concurred with Dr. Gregory's assessment despite Plaintiff's reports of swelling legs upon ambulation and a reported inability to stand or walk more than fifteen minutes at a time due to pain in her legs (Tr. 337). DDS case worker Roger B. McWhorter, after a brief review of the medical evidence, concurred with the two previous opinions (Tr. 357).

### d. Post-Hearing Treatment and MRI

On March 10, 2014, after securing new medical insurance, Plaintiff was treated by Ms. Lynette Womble, a nurse practitioner ("NP"). On March 31, 2014, Plaintiff obtained an MRI of her spine (Tr. 243). Plaintiff submitted these new records on June 3, 2014, to the Appeals Council for its review, but the Appeals Council declined to consider them on the ground they did not cover the relevant time frame of the appeal (Tr. 2).

On March 10, 2014, Plaintiff reported to NP Womble pain in her groin and swelling and pain in her right knee and leg radiating into the lower back (Doc. 10-1, Page ID # 475). She stated symptoms are worse upon standing or walking and her right leg "draws up." It feels "like a Charlie horse," and "nothing relieves the pain." *Id.* She reported taking muscle relaxers as

8

needed and Ibuprofen or Aleve. *Id.* An examination revealed lower back tenderness; straight leg raising test was negative, strength was 5/5, and reflexes were normal. Plaintiff was "able to bear weight but [sic] painful when moving or walking, the only time she does not feel much pain is when she is sitting in recliner with legs elevated…." *Id.* NP Womble prescribed Lyrica, 50 mg taken twice a day to be increased to three times a day after five days. *Id.* at Page ID # 476. NP Womble's assessment was radiculopathy and paresthesia. *Id.* at Page ID # 475.

The March 31, 2014, MRI scan showed pathology at L3-L4 with a small right lateral disc protrusion extending adjacent to the right L3 nerve root in the lateral foramen with questionable minimal contact (Doc. 10-1, Page ID # 473). There was a minimal broad based central disc protrusion of L1-L2 with a punctate annular tear in the posterior disc margin without evidence of advanced or canal foraminal stenosis. *Id.* There was also mild facet arthropathy noted at L2-3, L3-4 and L4-5. *Id.*

### 3. *Plaintiff's Reported Daily Activities*

In a function report dated February 9, 2012, Plaintiff gave an overview of her daily activities: she dresses; rests in a recliner; fixes breakfast and eats; washes dishes; feeds, waters, and lets the dog out; puts a small load of clothes in the washer; and watches her two minor grandchildren for about an hour after school until their mother returns from work (Tr. 212). She needs her husband to help her put on pants and socks (Tr. 212). She uses a microwave to prepare frozen dinners and completes meals with her husband's help (Tr. 213). She makes sandwiches; she cannot stand at a stove (Tr. 213). She can only stand or walk for about 15 minutes and so she must take frequent breaks when engaging in these activities (Tr. 213). She shops for food, clothes and household needs. It takes about 15 to 20 minutes – a little longer if she rides a cart in

the store (Tr. 214).  She sometimes visits with people on the phone, in person, or on the computer but not long on the computer (Tr. 215).  She can no longer mow the yard, sweep, do household chores in a timely manner, dress without help, wrestle with her grandchildren, or garden (Tr. 212, 215).  She needs help when baking (Tr. 215).  Completing chores takes a lot longer or she recruits help (Tr. 215).  She cannot take trips with the grandchildren or friends because she cannot "take walking or standing in line" (Tr. 216).  She "can't [line] dance much anymore; most things I do in small splirts [sic]" (Tr. 215).  She goes to therapy three times a week, grocery shops once a week, and picks up her grandchildren two to three times a week (Tr. 215).

In the hearing held before the ALJ on May 1, 2013, Plaintiff testified about her activities. She spends her time at home (Tr. 64).  She can't vacuum.  She has a front load washer on a pedestal which makes it easier for her to load laundry (Tr. 64-5).  She does a little at a time and then sits in a recliner with her legs up or lies on the loveseat with her legs up (Tr. 64, 66).  She does dishes a little at a time and then has to put her feet up (Tr. 56).  She puts her feet on a child's stool when sitting at the kitchen table to elevate her legs (Tr. 17).  Grocery shopping "wipes" her out (Tr. 18).  Her husband helps her dress (Tr. 17).  She uses a grab tool to pick things up from the floor (Tr. 19). The grandkids help her a lot (Tr. 19).  She cannot walk very far or stand long because her legs, knees, and back swell, and she must elevate her legs (Tr. 21).

## III. Analysis

### A. Standard of Review

To establish disability under the Social Security Act, a claimant must establish he/she is unable to engage in any substantial gainful activity due to the existence of "a medically

10

determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20 C.F.R. § 404.1520. The following five issues are addressed in order: (1) if the claimant is engaging in substantial gainful activity, he/she is not disabled; (2) if the claimant does not have a severe impairment, he/she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment, he/she is disabled; (4) if the claimant is capable of returning to work, he/she has done in the past he/she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy, he/she is not disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520; *Skinner v. Sec'y of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990). Once, however, the claimant makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy that he/she can perform considering his/her age, education and work experience. *Richardson v. Sec'y, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Sec'y, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir.

11

1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y, Health and Human Servs.,* 790 F.2d 450 n. 4 (6th Cir. 1986).

B. Analysis

Plaintiff alleges four separate errors: (1) the ALJ failed to give the opinion of the treating physician, Dr. Shibayama, proper weight; (2) the ALJ failed to properly evaluate Plaintiff's subjective complaints; (3) the hypothetical question to the vocational expert and relied upon by the ALJ was not properly based on Plaintiff's limitations; and (4) the Appeals Council improperly refused to consider new and relevant medical evidence. I will address the first two issues together. I decline to address the third issue relating to the hypothetical question because I conclude there is substantial evidence to support the ALJ's finding that Plaintiff can perform her relevant past work; thus, whether the hypothetical question was proper is moot. I will address the fourth issue last.

*1. Whether the ALJ Failed to Give The Opinion of the Treating Physician, Dr. Shibayama, Proper Weight and Failed to Properly Evaluate Plaintiff's Subjective Complaints*

Before step four of the sequential evaluation process, an ALJ must assess the claimant's Residual Functional Capacity ("RFC"). *See* 20 C.F.R. § 404.1520. An RFC assessment describes the most the claimant can do after considering the effects of all impairments on the

12

ability to perform work-related tasks.  *See* 20 C.F.R. § 404.1545; *Stankoski v. Astrue*, 532 F.

App'x 614, 619 (6th Cir. 2013) (unpublished).  "It is meant 'to describe the claimant's residual

abilities or what the claimant can do, not what maladies a claimant suffers from - though the

maladies will certainly inform the ALJ's conclusion about the claimant's abilities.'" *Stankoski*,

532 F. App'x at 619 (quoting *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir.

2002)).

      The ALJ determined that Plaintiff retained the RFC to perform a full range of light work

and thus was able to perform her past relevant work (Tr. 40).  Pursuant to the regulations, light

work involves lifting no more than 20 pounds at a time, frequent lifting or carrying of objects

weighing up to 10 pounds, and standing and/or walking, off and on, for a total of approximately

6 hours of an 8-hour day.  20 C.F.R. § 404.1567(b); Social Security Ruling (SSR) 83-10.  In so

finding, the ALJ rejected Dr. Shibayama's work restriction requiring a 15 minute sit/stand option

and did not find credible Plaintiff's subjective complaints of pain and swelling necessitating a 15

minute sit/stand option and the ability to rest with her legs elevated much of the day.  Plaintiff

argues that, in failing to accept this fifteen minute sit/stand restriction from Dr. Shibayama, the

ALJ has failed to follow the treating physician rule.  Plaintiff also argues the ALJ failed to assess

her subjective complaints properly.  Both the "treating physician rule" and the two-pronged

analysis used to assess subjective complaints inform the undersigned's review of the ALJ's

decision.

      *a. Treating Physician Rule*

      The Sixth Circuit in *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014)

discussed the parameters of the treating physician rule which

requir[es] the ALJ to give controlling weight to a treating physician's opinion as to the nature and severity of the claimant's condition as long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2) (language moved to 20 C.F.R. § 404.1527(c)(2) on March 26, 2012). The premise of the rule is that treating physicians have the best detailed and longitudinal perspective on a claimant's condition and impairments and this perspective "cannot be obtained from objective medical findings alone." 20 C.F.R. § 416.927(d)(2) (language moved to 20 C.F.R. § 416.927(c)(2) on March 26, 2012). Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Rogers*, 486 F.3d at 242. In all cases, the treating physician's opinion is entitled to great deference even if not controlling. *Id.* The failure to comply with the agency's rules warrants a remand unless it is harmless error. *See Wilson*, 378 F.3d at 545–46.

### b. Two Pronged Pain Analysis

A claimant's statement that she is experiencing disabling pain or other subjective symptoms will not, taken alone, establish she is disabled. 20 C.F.R. §§ 404.1529(a) and 416.929(a). Evaluating subjective complaints such as pain requires a two step analysis known in this circuit as the *Duncan* test. *See Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Under the *Duncan* test,

> [f]irst, we examine whether there is objective medical evidence of an underlying medical condition. [Second], [i]f there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (quoting *Duncan v. Sec'y of Health and Human Servs.,* 801 F.2d 847, 853 (6th Cir. 1986)).

14

Objective medical evidence constitutes medical signs and/or laboratory findings as defined in 20

C.F.R. §§ 404.1528(b)- (c) and 416.929(b)-(c).[3] However, the *Duncan* test "does not require

objective evidence of the pain itself." *Felisky*, 35 F.3d at 1039 (internal citation omitted). The

Commissioner may examine a number of other factors besides medical signs and laboratory

findings to determine the severity of the alleged pain or other subjective symptoms once the

underlying impairment is established by objective medical evidence. As the Social Security

regulations explain,

> When the medical signs or laboratory findings show that you have a medically
> determinable impairment(s) that could reasonably be expected to produce your
> symptoms, such as pain, we must then evaluate the intensity and persistence of

---

[3] 20 C.F.R. § 404.1528 provides:
Symptoms, signs, and laboratory findings.

Medical findings consist of symptoms, signs, and laboratory findings:

(a) Symptoms are your own description of your physical or mental impairment.
Your statements alone are not enough to establish that there is a physical or
mental impairment.

(b) Signs are anatomical, physiological, or psychological abnormalities which can
be observed, apart from your statements (symptoms). Signs must be shown by
medically acceptable clinical diagnostic techniques. Psychiatric signs are
medically demonstrable phenomena that indicate specific psychological
abnormalities, e.g., abnormalities of behavior, mood, thought, memory,
orientation, development, or perception. They must also be shown by observable
facts that can be medically described and evaluated.

(c) Laboratory findings are anatomical, physiological, or psychological
phenomena which can be shown by the use of medically acceptable laboratory
diagnostic techniques. Some of these diagnostic techniques include chemical
tests, electrophysiological studies (electrocardiogram, electroencephalogram,
etc.), roentgenological studies (X-rays), and psychological tests.

your symptoms so that we can determine how your symptoms limit your capacity
for work….

20 C.F.R. § 404.1529 (c)(1); s*ee also Felisky*, 35 F.3d at 1037-40.

In addition to the objective medical evidence, the claimant's own statements regarding
the severity of her pain will be considered, and, in considering those statements, the claimant's
credibility will also be evaluated. *See Felisky*, 35 F.3d 1036-37 (examining the plaintiff's
credibility). It is the province of the Commissioner, not the reviewing court, to make credibility
findings, but the Commissioner must clearly state her reasons if she finds the claimant to be
lacking in credibility. *Felisky*, 35 F.3d at 1036; *see also, White v. Comm'r Soc. Sec.*, 572 F.3d
272, 287 (6th Cir. 2009) ("The ALJ's credibility findings are subject to substantial deference on
review...") (quoting *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir.1994)); *Blacha v. Sec'y of
Health and Human Servs.*, 927 F.2d 228, 230 (6th Cir. 1990) (an ALJ's finding regarding the
credibility of a claimant's testimony is entitled to great deference).

In addition to the objective medical evidence and the claimant's own statements, other
evidence to be considered to assess the severity of a claimant's subjective complaints include the
claimant's daily activities; the location, duration, frequency, and intensity of the pain or other
symptoms; precipitating and aggravating factors; medication taken to alleviate pain and other
symptoms; treatment other than medication received for relief of pain or other symptoms; and
any other measures used to relieve the pain or other symptoms (e.g., such as lying down or
standing for 15 to 20 minutes every hour). 29 C.F.R. § 404.1529(c)(3); *see also Felisky*, 35 F.3d
at 1037-38 (discussing 29 C.F.R. § 404.1529 pertaining to the evaluation of pain).

*c. Discussion*

16

There is no dispute that Plaintiff meets the first prong of the *Duncan* test.  The objective medical evidence in the form of an MRI and observations during surgery clearly document Plaintiff's spondylolisthesis at L3-4.  Thus, the undersigned moves to the first part of the second prong.

Neither Dr. Shibayama nor any of the DDS consultants found that the objective medical evidence itself confirmed the severity of the pain Plaintiff alleges she was suffering as a result of the spondylolisthesis.  However, Plaintiff may still prevail if she can show under part two of the second prong that the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *See Felisky*, 35 F.3d at 1039. Under this second part, the undersigned will consider the objective medical evidence, any opinion of the treating physician, the Plaintiff's own statements regarding her pain, and the other factors listed in 29 C.F.R. § 404.1529(c)(3).

The ALJ found that the 15 minute sit/stand restriction imposed by Dr. Shibayama was based entirely on Plaintiff's subjective statements to him. The ALJ found this restriction was inconsistent with the medical record.  The ALJ also found Plaintiff's own assessments regarding her pain, her restrictions on extended walking, and her need to alternate between sitting and standing to be incredible.

As to Dr. Shibayama, the ALJ noted a lack of a "proper function-by-function assessment" of Plaintiff's functional capacity and stated "his proposed limitations far exceed the benign findings contained in his examination notes" (Tr.  43).  The undersigned agrees with this assessment.  Noting the absence of a proper function-by-function assessment is significant because it is an acknowledgement that Dr. Shibayama relied entirely on Plaintiff's own

17

statements to give such a restriction; the restriction was not based on an independent analysis of the medical evidence by Dr. Shibayama. Further, Dr. Shibayama's treatment notes do not support the restriction. During Plaintiff's post-surgical visits, she was walking well and her strength in all lower extremity muscle groups measured 5/5. Three months after surgery, December 8, 2011, Plaintiff reported taking her pain medication infrequently and walking a lot, though she reported some swelling in her legs. With regard to the swelling, Dr. Shibayama stated he did not think it was related to the lumbar spine, and he referred her to her primary care physician. On January 5, 2012, Dr. Shibayama noted the swelling was much better and Plaintiff's diuretic medication had been increased. Significantly, Plaintiff reported taking only one Percocet in the past month, that pain was not a problem but swelling in the legs was. On February 16, 2012, Dr. Shibayama noted "no appreciable swelling" of her back and that she had 5/5 strength in all lower extremity muscle groups. He also noted the hardware placed in Plaintiff's back during surgery "is in excellent position [and] [t]he interbody fusion is consolidating well" (Tr. 320). Because of Plaintiff's reports of leg pain, Dr. Shibayama prescribed Neurontin.[4]

The ALJ also did not find Plaintiff's self-reported limitations credible for several reasons. First, the ALJ said Dr. Shibayama had referred Plaintiff for another MRI and further physical therapy "well before she was allegedly terminated from employment" and had lost her healthcare coverage, but Plaintiff failed to do either. However, as Plaintiff accurately notes in her brief,

_____

[4] Neurontin is a medicine used to help relieve certain types of nerve pain. Neurontin is also used to treat partial seizures when taken in combination with other medicines. PDRHealth, Physician's Desk Reference, http://www.pdrhealth.com/drugs/neurontin (last visited February 25, 2016).

while Dr. Shibayama advised her to obtain more physical therapy and an MRI on February 9, 2012, she was sent home from work on February 12, 2012, and terminated shortly thereafter. Thus, Plaintiff did not have ample time to engage in more physical therapy or obtain an MRI before losing her health insurance.

Second, the ALJ concluded "the claimant has offered inconsistent reports regarding her level of activity" (Tr. 43). The ALJ found that despite her testimony at the hearing that she must remain in a recliner with her legs elevated "for much of a normal day" (Tr. 43), Plaintiff stated in her function report dated February 9, 2012, that she prepared simple meals, helped care for a pet, washed dishes, babysat her grandchildren, daily used a computer, shopped unassisted, and drove herself (Tr. 43). The ALJ also found significant that in regard to one of her hobbies, line dancing, the Plaintiff wrote she could not "dance *much* anymore" (emphasis by the ALJ) (Tr. 43). The ALJ concluded, "[a]s such, I find the claimant's allegations and testimony not wholly consistent with the preponderance of the medical evidence; and thus, somewhat unpersuasive" (Tr. 43-44).

Careful consideration of Plaintiff's testimony at the hearing reveals nothing inconsistent with the statements she made in the function report. She indicated in the function report that her daily activities were severely circumscribed due to her need to take frequent breaks to elevate her legs to relieve swelling and the concomitant pain. No activity she listed on her function report requires more than about 20 minutes of being on her feet and she engages in each intermittently. She shops only once a week and it takes 20 minutes. Her time on the computer is limited. She reports she cannot vacuum, sweep, and stand at the stove. While she keeps her school age grandchildren for about an hour a few times a week, she indicated they help her with chores, and,

19

in any event, this task would not require her to be on her feet during the hour that she keeps

them. Feeding and watering an animal takes no more than a few minutes. She heats meals in the

microwave and make sandwiches. There is nothing in these activities which indicated she would

be able to stand or walk six hours of the day, five days a week as a light duty job would require.

Thus I do not find any inconsistencies in her stated activities which could be a reasonable basis

for discrediting her testimony.

Third, the ALJ noted that Plaintiff did not submit her medical records from the Maury

County Health Department prior to her hearing before the ALJ. I find this of no consequence

because the records from the Maury County Health Department show the Health Department did

not treat her for back or leg pain.

On the other hand, there are other reasonable bases for discrediting Plaintiff's self-

reported limitations. The treatment notes, as previously discussed, do not support the Plaintiff's

claims of severe swelling and pain in her legs necessitating a 15 minute sit/stand option or

keeping her legs elevated for several hours a day. Further, Plaintiff was taking a negligible

amount of pain medication when she last saw Dr. Shibayama – a fact which belies her reports of

disabling pain in her legs. Plaintiff notes in her brief that Dr. Shibayama prescribed a new pain

medication, Neurontin, during the last visit to him; however, there was no indication that she had

discontinued the Percocet due to side effects or complications; rather, the record indicates she

did not take it because she didn't feel she needed it.

On balance, while not every bases relied upon by the ALJ to discredit Plaintiff's reports

of pain were reasonable, there remains substantial evidence, as discussed above, to conclude the

ALJ properly refused to credit either the Plaintiff's subjective complaints of pain or Dr.

Shibayama's 15 minute sit/stand option.

As previously indicated, Plaintiff bears the burden to show she cannot perform the functions of her past relevant work, a burden Plaintiff has not met; consequently, I conclude that the Commissioner's decision that Plaintiff can perform the full range of light work is supported by substantial evidence.

*2. Whether the Appeals Council Improperly Refused to Consider New and Relevant Medical Evidence*

As previously discussed, Plaintiff submitted March 10, 2014, treatment notes from a nurse practitioner and March 31, 2014, MRI results to the Appeals Council for its consideration. Pursuant to Sentence Six of 42 U.S.C. § 405(g), the administrative record may be reopened for consideration of evidence not previously presented to the ALJ prior to her decision. *Hollon v. Comm'r Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006); *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir.1994). Two requirements must be met before the record can be reopened. First, the evidence must be new and material, and, second, there must be good cause for the failure to submit the evidence into the administrative record earlier. *Hollon,* 447 F.3d at 483; *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996). The burden is on the party seeking remand. *Hollon,* 447 F.3d at 483. Under this standard, "evidence is new only if it was not in existence or available to the claimant at the time of the administrative proceeding. Such evidence, in turn, is deemed "material" if there is a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Hollon,* 447 F.3d at 483-84 (internal citations omitted).

The MRI results and treatment notes from March 2014 did not exist at the time the ALJ

issued her decision on May 10, 2013.  However, the Appeals Council determined they were not material because they were not relevant to the time period at issue.

This new evidence was submitted ten months after the record was closed (May 10, 2013), and I conclude it is not relevant to the time period at issue.  Moreover, even if it were temporally relevant, I do not find there is a reasonable probability it would have changed the outcome of the Commissioner's decision.  The March 31, 2014, MRI is substantially similar to the August 17, 2011, MRI.  Moreover, as of her March 10, 2014, visit to NP Womble, Plaintiff was still not taking anything more than a muscle relaxant and Ibuprofen or Aleve for pain.  Accordingly, I conclude the Appeals Council did not err in refusing to consider the March 2014 medical evidence.

## IV. Conclusion

Having carefully reviewed the entire administrative record and the briefs of the parties filed in support of their respective motions, I conclude there is substantial evidence in the record to support the findings of the ALJ and the decision of the Commissioner, and neither reversal nor remand is warranted on these facts. Accordingly, I RECOMMEND:

(1) The Plaintiff's Motion for Summary Judgment (Doc. 10) be DENIED.

(2) The Defendant's Motion for Summary Judgment (Doc. 11) be GRANTED.

(3) The case be DISMISSED. [5]

s/*Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE

---

[5]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).